## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

**JAMES MELVIN,**

   *Plaintiff*,

**v.**                                          **Case No.  SA-22-CV-01323-JKP**

**HOBBY LOBBY STORES, INC,**

   *Defendant*.

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Defendant Hobby Lobby Stores, Inc.'s Motion for Summary Judgment. *See* ECF No. 18. Plaintiff James Melvin filed a response and Hobby Lobby replied to the response. *See* ECF No. 19, 21. After due consideration of the parties' briefings, the record evidence, and the applicable law, the Court finds Melvin has met his burden to establish a genuine dispute for trial as to his retaliation claim but not as to his discrimination claim and, therefore, **GRANTS IN PART** and **DENIES IN PART** Hobby Lobby's Motion for Summary Judgment. *See* ECF No. 18.

## BACKGROUND

Plaintiff James Melvin, who is Black, brings this employment discrimination suit against his former employer, Defendant Hobby Lobby, alleging he was fired for refusing to clean the restrooms when he complained the assignment was discriminatory. Melvin worked part-time at Hobby Lobby's Rim location in northwest San Antonio for fourteen months before his firing. According to Melvin, he was hired as a Customer Service Manager (CSM), though Hobby Lobby disputes that characterization and says he was hired as a cashier. Melvin understood his

primary job duties and responsibilities to include resolving customer service issues at the point-of-sale and believed stocking and janitorial work to be outside the scope of his position.

Several months into his tenure at Hobby Lobby, Melvin alleges he was suddenly singled out and asked to perform tasks he understood other CSMs were not asked to perform. For instance, he would be asked to go outside and collect carts and clean them, use a box cutter blade to peel stickers off the floor, and vacuum. Believing he was the only CSM asked to perform these tasks, Melvin concluded he was being singled out on the basis of his race. Accordingly, Melvin reported his concerns to Hobby Lobby's Store Manager Fred Mendoza, who thanked Melvin for bringing these issues to his attention and assured Melvin he would handle them. For a short period of time after reporting his concerns to Mendoza, Melvin was not asked to perform tasks he understood to be outside the scope of his work. But, by December 2020, Melvin was told he was being moved from CSM shifts to cashier shifts. Melvin learned Taylor Murrow, who is White, would be picking up his CSM shifts. Melvin again believed he was being treated differently on the basis of his race and in retaliation for reporting his concerns to management. According to Hobby Lobby, the switch was made because Murrow, who was on a full-time schedule, was available more hours than Melvin, who worked part-time.

On January 11, 2021, Melvin wrote a letter to Mendoza and District Manager Bobby Bills to express his disappointment and ask for a formal meeting to discuss his concerns. During this meeting, Melvin explained he did not understand the move to cashier shifts and he believed Hobby Lobby lacked diversity in its management. Melvin explained he had traveled to each one of Hobby Lobby's stores within the district and could not find any Black managers. Melvin expressed concerns with his changing role and questioned his future in the company as a Black man. Thirty minutes after the meeting ended, Melvin was called back into a meeting with

Mendoza and Assistant Manager Les Alcock. Mendoza told Melvin Hobby Lobby had a policy of terminating employees after they have six "occurrences." At this point, Melvin did not have any write-ups or disciplinary actions in his personnel file. When Melvin asked why he was being told this after the meeting with the District Manager, he was told Hobby Lobby did not want to be in a position at which he had too many "occurrences" and he needed to be "let go." Melvin understood this to be a threat based on his complaints of discrimination.

Melvin continued working without issue as a cashier for the following months; however, on one occasion, when he went outside to collect carts, he was locked out of the building. Alcock was at the door and when Melvin asked to be let back in Alcock said, "Don't you get the hint?" Melvin understood this to be a reference to the meeting with Mendoza and Alcock at which Melvin was threatened to be fired if he had too many "occurrences." This solidified Melvin's belief that he was being encouraged to quit or be fired because he had complained about discrimination.

On Saturday, August 28, 2021, Melvin reported to the front cashier for his shift to begin as stated on the Daily Assignment Sheet. CSM Matt Jiminez came to the front and told Melvin he needed to go clean the restrooms and a stocker would be pulled from the back to cover Melvin's register. Melvin immediately requested to meet with the on-duty manager, Jesse Luna, and explained the issue. Melvin told Luna he had already met with Mendoza and Bills about this issue and thought it was prejudiced and racist for him to be assigned to clean the restrooms in light of the prior concerns he raised. Melvin told Luna he wanted to go to the Bitters location to speak with Bills himself. Luna never told Melvin he needed to clean the restrooms, nor did Luna tell Melvin he could not leave the store to speak with Bills. When Melvin learned Bills would not return to work until Monday, Melvin planned to go to meet with him then, but he never got the

chance. On the morning of Monday, August 30, 2021, Melvin received a telephone call from Mendoza and was told he was terminated immediately for "insubordination" and "failure to follow company policies" for walking off his shift. Melvin believes the reason given for his termination was pretextual and he was actually fired for discriminatory and retaliatory reasons.

Melvin brings claims of racial discrimination and retaliation against Hobby Lobby in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a), Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a), and the Texas Labor Code §§ 21.051, 21.055, & 21.125. Hobby Lobby argues the Court should dismiss Melvin's case because he cannot make a prima facie case for discrimination and retaliation and cannot show Hobby Lobby's reasons for firing Melvin were pretextual. Hobby Lobby further suggests the case should be dismissed because Melvin failed to mitigate his damages. The Court finds Melvin has established a prima facie case for retaliation, but not discrimination. The Court further finds Melvin proffered sufficient evidence to create a fact issue as to whether the reasons given for his termination for his retaliation case were pretextual and whether he failed to mitigate. The Court, therefore, grants in part and denies in part Hobby Lobby's motion for summary judgment. Melvin's retaliation claim shall proceed to trial.

## LEGAL STANDARD

Summary judgment is appropriate if the record shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Rodriguez v. Pacificare, Inc.*, 980 F.2d 1014, 1019 (5th Cir. 1993).[1] "A fact is material only if its resolution would affect the outcome of the action." *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009).

---

[1] Although 2010 amendments replaced "issue" with "dispute," the summary judgment standard "remains unchanged." Fed. R. Civ. P. 56 advisory committee notes (2010 amend.).

4

A genuine dispute for trial exists if the record taken as a whole could lead a reasonable trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010). Because there must be a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247–48 (1986).

The moving party bears the initial burden of informing the court of the basis for the motion and of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact or the appropriateness of judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323; *Adams v. Travelers Indem. Co.*, 465 F.3d 156, 163 (5th Cir. 2006). The movant is not required to negate the elements of the nonmovant's case but may satisfy its summary judgment burden by demonstrating the absence of facts supporting specific elements of the nonmovant's cause(s) of action. *Little v. Liquid Air Corp.*, 37 F. 3d 1069, 1075, 1076 n.16 (5th Cir. 1994).

To satisfy this burden, the moving party must provide affidavits or identify any portion of the pleadings, discovery or admissions that demonstrate the absence of a triable dispute of material fact. *Celotex Corp.*, 477 U.S. at 323; *Rodriguez*, 980 F.2d at 1019. "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014).

If the movant carries its initial burden, the burden shifts to the nonmovant to present competent summary judgment evidence showing the existence of a genuine dispute of material fact. *Matsushita*, 475 U.S. at 586–87; *see also* Fed. R. Civ. P. 56(c). Upon the shifting burden, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not

sufficient to defeat a motion for summary judgment." *Brown v. City of Houston, Tex.*, 337 F.3d 539, 541 (5th Cir. 2003); *see also Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which this evidence raises a genuine dispute of material fact. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)). Further, should the nonmoving party fail "to address or respond to a fact raised by the moving party and supported by evidence, the court may consider the fact as undisputed" and "[s]uch undisputed facts may form the basis for a summary judgment." *Broadcast Music*, *Inc. v. Bentley*, SA-16-CV-394, 2017 WL 782932, at *2 (W.D. Tex. Feb. 28, 2017).

In determining the merits of a motion for summary judgment, a court has no duty to search the record for material fact issues or to find a party's ill-cited evidence. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012); *Ragas*, 136 F.3d at 458. In addition, a court may not make credibility determinations or weigh the evidence and must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Boudreaux v. Swift Transp. Co.*, *Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).

## ANALYSIS

Melvin brings state and federal law claims of unlawful discrimination and retaliation based on race. Courts apply the same standards to state Texas Commission on Human Rights Act (TCHRA) claims as federal Title VII claims, interpreting state claims "in a manner consistent with federal laws prohibiting employment discrimination." *Martin v. Kroger Co.*, 65 F. Supp. 2d 516, 530 (S.D. Tex. 1999) (quoting *Allison v. City of Fort Worth*, 60 F. Supp. 2d 589, 593 (N.D.

Tex. 1999)). Therefore, the analysis applied to Melvin's causes of action brought under the TCHRA is identical to the analysis applied to his claims brought under Title VII. *See id.*

Title VII makes it unlawful for covered employers to discriminate against individuals with respect to their "terms, conditions, or privileges of employment, because of [their] race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* § 2000e-2(m). Title VII also prohibits employers from retaliating against an employee for (1) opposing any employment practice made unlawful by its provisions and (2) making a charge, testifying, assisting, or participating in "in any manner in an investigation, proceeding, or hearing" under its provisions. *Id.* § 2000e-3(a). Courts assess Title VII retaliation claims by applying "traditional principles of but-for causation," which require proof "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

Plaintiffs may prove Title VII claims of "intentional discrimination or retaliation either by direct or circumstantial evidence." *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *accord Stroy v. Gibson ex rel. Dep't of Veterans Affairs*, 896 F.3d 693, 698 (5th Cir. 2018). When analyzing Title VII claims of disparate or discriminatory treatment, courts utilize the burden-shifting framework set out in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973) unless there is direct evidence of discrimination. *See Stroy*, 896 F.3d at 698. That same "framework applies to Title VII retaliation claims brought under a pretext theory." *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005); *accord Porter v.*

*Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 948 (5th Cir. 2015). Not only does this framework apply at trial, *see McDonnell*, 411 U.S. at 802, but it also applies on summary judgment, *see Vaughn v. Woodforest Bank*, 665 F.3d 632, 635–36 (5th Cir. 2011).

"Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact (i.e., unlawful discrimination) without any inferences or presumptions." *Palacios v. City of Crystal City*, 634 F. App'x 399, 402 (5th Cir. 2015) (per curiam) (quoting *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 958 (5th Cir. 1993)). "If an inference is required for the evidence to be probative … the evidence is circumstantial, not direct." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897–98 (5th Cir. 2002).

Under the *McDonnell Douglas* framework, plaintiffs must first establish "by the preponderance of the evidence a prima facie case of discrimination," *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981), or retaliation, *McCoy*, 492 F.3d at 556–57. Carrying this initial burden creates an inference or presumption of discrimination, *see Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000); *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978), or retaliation, *see Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 427 (5th Cir. 2017). "The burden of establishing a prima facie case of disparate treatment is not onerous." *Burdine*, 450 U.S. at 253; *accord Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 892 (5th Cir. 2012) (quoting *Burdine*). Nor is it onerous in the retaliation context. *See Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 n.6 (5th Cir. 2003); *Arismendiz v. Univ. of Tex. at El Paso*, 536 F. Supp. 2d 710, 716 (W.D. Tex. 2008). The prima facie case is flexible and necessarily varies in Title VII cases depending on the particular circumstances. *Burdine*, 450 U.S. at 253 n.6.

With respect to the claims of disparate treatment and retaliation in this case, Melvin presents no direct evidence of discrimination or retaliation. Accordingly, the *McDonnell Douglas* framework applies and Melvin bears the burden of establishing, by a preponderance of the evidence, a prima facie case of discrimination and retaliation. *Burdine*, 450 U.S. at 252–53; *McCoy*, 492 F.3d at 556–57.

Once the plaintiff establishes a prima facie case, "the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action." *McCoy*, 492 F.3d at 557; *accord Wheat*, 811 F.3d at 710. This "burden is only one of production, not persuasion, and involves no credibility assessment." *McCoy*, 492 F.3d at 557; *accord Burdine*, 450 U. S. at 254–55; *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 561 (5th Cir. 2019), *as revised* (Dec. 10, 2019) and *as revised* (Dec. 23, 2019) (citing *Reeves*, 530 U.S. at 142). If the employer satisfies its burden, "the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory or retaliatory purpose." *McCoy*, 492 F.3d at 557. Plaintiffs have two alternatives to refute the employer's articulated reason by offering evidence sufficient to create a genuine dispute of material fact. *Rachid v. Jack in the Box*, 376 F.3d 305, 312 (5th Cir. 2004). Through the mixed-motives alternative, they must show "that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic." *Id*. Through the pretext alternative, they must show "that the defendant's reason is not true, but is instead a pretext for discrimination." *Id*. Under this latter alternative, they must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253.

The Court will first assess whether Melvin established a prima facie case of discrimination and retaliation and then will turn its attention to Hobby Lobby's failure to mitigate affirmative defense.

### I.    Discrimination

In general, to establish a prima facie case of discrimination, the plaintiff must show (1) membership in a protected group; (2) they are "qualified for the position at issue"; (3) an "adverse employment action by the employer"; and (4) being replaced by someone outside the protected group or being "treated less favorably than other similarly situated employees outside the protected group." *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). In this case, Hobby Lobby does not dispute, in satisfaction of elements (1) and (2), that Melvin, who is Black, is a member of a protected group, nor does it dispute he was qualified for his position at Hobby Lobby. Instead, Hobby Lobby contests whether, under element (3), any of Melvin's purported adverse employment actions, with the exception of his firing, are cognizable. Hobby Lobby further suggests, under element (4), Melvin cannot proffer sufficient evidence to establish he was replaced by someone outside the protected group or treated less favorably than other similarly situated employees outside the protected group.

The Court agrees with Hobby Lobby's contention that, even under the more expansive definition of "adverse employment action" announced by the Fifth Circuit in *Hamilton v. Dallas County*, only Melvin's firing constitutes a potentially cognizable adverse employment action. *See* 79 F.4th 494, 501 (5th Cir. 2023). In *Hamilton*, the Fifth Circuit held that Section 703 is not limited to "ultimate employment decisions," but includes employment actions affecting "a term, condition, or privilege of employment." 79 F.4th at 501 (quoting *Hishon v. King & Spalding*, 467 U.S. 469, 77 (1984)). Melvin offers two circumstances which he says constitute adverse

employment actions giving rise to liability under Title VII: (1) he was required to perform tasks outside the scope of his job responsibilities, such as collecting and cleaning carts, scraping stickers off the floor, and serving as a stocker or janitor for a day and (2) his job description was switched from from Customer Service Manager (CSM) to cashier. Neither of these are adverse employment actions.

As an initial matter, Hobby Lobby offers evidence showing the tasks Melvin describes as menial were not outside his job responsibilities, but rather tasks expected of all non-management employees. According to Hobby Lobby, the company expects all store employees to assist in other departments as needed, fill-in for another role, perform any manager-directed task, and aid in the overall upkeep and cleanliness of the store, notwithstanding the role the employee generally works at the store. *See* Mendoza Decl. ¶¶ 7–8, 10–11, 16, 28 (Def. Ex. B). Hobby Lobby considers these essential functions of the job that all employees, including Melvin, acknowledge upon hire. *See id*. ¶¶ 7, 10, 25; Def. Ex. A-1 at 1; Pl. Dep. 118:4–119:23 (Def. Ex. C). Further, although Hobby Lobby concedes CSMs generally stay within a certain perimeter up front during store hours, it is not uncommon for another employee to temporarily cover the front-end to permit a CSM to leave the designated registered perimeter to perform another manager-directed task. *See* Mendoza Decl. ¶ 12. Melvin points to Hobby Lobby's CSM Manual as evidence scraping stickers off the floor and collecting and cleaning carts were not part of his assigned duties; however, Hobby Lobby counters it is unaware of any job description or employee manual specifically listing these tasks as job duties for any specific role. Moreover, Melvin concedes he was never told that only stockers would be required to perform these tasks. *See* Pl. Dep. 128:2–15 (Pl. Ex. C). To the contrary, Melvin testified that one of his assigned responsibilities as a CSM was to clean carts during the pandemic. *See id*. 168:5–12. Viewing

these facts in the light most favorable to Melvin, the Court finds Hobby Lobby's assignment of the tasks Melvin takes issue with could not, as a matter of law, alter a term, condition, or privilege of Melvin's employment, even under *Hamilton*'s broad standard, because they were tasks assigned to all employees at his level.

The same is true with respect to Mendoza's decision to assign Melvin more cashier shifts beginning in December 2020. Melvin alleges that due to a "glitch" in Hobby Lobby's computer system, Hobby Lobby inaccurately classified him as a cashier when he was actually a CSM. Hobby Lobby counters there was no glitch—part-time employees like Melvin were not eligible to be CSMs under Hobby Lobby corporate policy, but Melvin was given CSM shifts by his manager. *See* Mendoza Decl. ¶¶ 5–6; Bills Decl. ¶ 20 (Def. Ex. A); Def. Ex. A-4 at 2. Moreover, Hobby Lobby explains the difference between a cashier and a CSM is *de minimis*. Both positions receive the same rate of pay and, though they perform slightly different job duties, CSMs do not have more "power" than cashiers, do not occupy a "higher" position within the store hierarchy, and are no more "essential" to the store's operations than any other non-management, hourly store employee. *See* Mendoza Decl. ¶¶ 9–10, 16. The Court does not doubt that Melvin genuinely believes Hobby Lobby demoted him from cashier to CSM. Melvin's genuine beliefs, no matter how sincere, are not competent summary judgment evidence and cannot create a genuine dispute of matter fact that Hobby Lobby demoted him. "A Plaintiff's subjective beliefs are not sufficient to create an issue of fact." *Salinas v. AT&T Corp.*, 314 Fed. App'x. 696, 699 (5th Cir. 2009); *see also Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 153 (5th Cir. 1995); *see also Elliot v. Group Medical & Surgical Service*, 714 F.2d 556, 567 (5th Cir. 1983). Here, the undisputed summary evidence shows Melvin was never classified as a CSM by Hobby Lobby. Furthermore, Hobby Lobby proffers competent summary judgment evidence showing

that because the difference between CSM and cashier positions is *de minimis*, Hobby Lobby's assignment of cashier, rather than CSM, shifts to Melvin did not alter a term, condition, or privilege of Melvin's employment. Melvin presents no competent summary judgment evidence in rebuttal. The Court therefore finds, even viewing the facts in the light most favorable to Melvin, Melvin's claim with respect to being assigned cashier shifts fails as a matter of law.

Only Melvin's termination constitutes an adverse employment action. Yet here, Melvin fails to satisfy the fourth element of an employment discrimination claim—that is, he fails to show he was replaced by someone outside the protected group or treated less favorably than other similarly situated employees outside the protected group. Melvin attempts to satisfy this element by showing the only other employees who Hobby Lobby fired for insubordination were a Black man and a Hispanic woman. In doing so, Melvin shows someone of his race who engaged in similar conduct was treated similarly. This fact, however, does not prove the inverse. Melvin's burden is to show someone outside his race replaced him or was similarly situated and treated more favorably. Melvin generally alleges other, unnamed employees engaged in other types of misconduct, such as calling out, clocking out early, or arriving late, and were not punished as harshly as him. Such vague statements, unsupported by evidence, are insufficient to meet his summary judgment burden.

The Court, therefore, finds Melvin has failed to offer sufficient evidence to meet the fourth element of a prima facie case for discrimination and his discrimination claim fails as a matter of law. Because the Court finds Melvin has failed to make a prima facie case, it need not address Hobby Lobby's purported non-discriminatory reason for his termination.

## II.      Retaliation

To establish a prima facie case in the retaliation context a plaintiff must show: (1) participation "in an activity protected by Title VII"; (2) "an adverse employment action" by the employer; and (3) "a causal connection exists between the protected activity and the adverse employment action." *McCoy*, 492 F.3d at 556–57; *accord Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016). Here, Hobby Lobby questions whether Melvin can show he engaged in any cognizable protected activity and, in the event the Court finds he can, whether that activity was causally connected to an adverse employment action. The Court finds Melvin satisfies both elements.

Under Title VII, a "protected activity" may be either (1) opposing activity made an unlawful employment practice under Title VII or (2) participating in any manner in an investigation or proceeding under Title VII. *EEOC v. Rite Way Serv., Inc.*, 819 F.3d 235, 239 (5th Cir. 2016). Here, Melvin made complaints to his Store Manager, Mendoza, and his District Manager, Bills, that he believed he was being singled out on the basis of his race, he was demoted based upon his race, he did not believe he was treated equally on the basis of his race, and Hobby Lobby failed to promote people of his same race into leadership positions in this specific District. *See* Pl. Ex. J, Pl. Letter; *see also* Pl. Ex. C, Pl. Dep. 141–187. Specifically, when Mendoza switched Melvin from CSM shifts to cashier shifts, Melvin wrote a formal letter to Hobby Lobby to complain. *See* Pl. Ex. J, Pl. Letter. Hobby Lobby characterizes Melvin's letter as "vague," arguing it would not have alerted Hobby Lobby to Melvin's belief he was subjected to unlawful discrimination. The letter's text, however, clearly articulates Melvin's concern. It says "I provide great service regardless of race, gender, religion, or national origin. I'm not convinced that I receive the same service at this moment." *See* Def. Ex. A-1 at 10–11. A

reasonable reader would interpret that statement to mean Melvin believed he was being discriminated against by Hobby Lobby.[2] Bills' and Mendoza's conclusory, self-serving statements to the contrary are unavailing. *See* Mendoza Decl. ¶¶ 19, 21–22; Bills Decl. ¶¶ 3, 5–6. Furthermore, Melvin was terminated within days of complaining his work assignment was prejudicial and indicating he wanted to lodge an additional complaint with Bills and Mendoza. *See* Pl. Ex. M, HR Report. The Court finds Melvin's letter, meeting with Bills and Mendoza, and subsequent complaint about prejudice are sufficient to establish he engaged in protected activities.

Next Melvin must show a causal connection exists between the protected activity and the adverse employment action. As the Court already established, Melvin's only cognizable adverse employment action is his termination. In this case, Melvin has proffered sufficient evidence to establish he was fired in retaliation for reporting alleged discrimination. The same day Melvin met with Bills and Mendoza to report discrimination, Melvin was brought into another meeting with Medoza and Alcock where he was warned that if he had six "occurrences," he would be immediately terminated. *See* Pl. Ex. C, Pl. Dep. 188:4–25; *see also* Pl. Ex. A, Mendoza's Decl. ¶ 24. The temporal proximity between this threat of termination with Melvin's complaint about discrimination is some evidence of a causal connection. *See, e.g., E.E.O.C. v. Rite Way Serv., Inc.*, 819 F.3d 235, 245 (5th Cir. 2016). Alcock then later commented, after locking Melvin out of the store, "Don't you get the hint?" *See* Pl. Ex. C, Pl. Dep. 251:20–252:13. The Fifth Circuit has recognized similar "cryptic" statements as the sort of comment from which a reasonable jury could infer retaliatory intent. *Rite Way Serv., Inc.*, 819 F.3d at 245.

---

[2] The Court notes Melvin's belief he was being discriminated against is credited for the purpose of establishing a retaliation claim. The Fifth Circuit has long held a plaintiff contending they were retaliated against for proactively reporting employment discrimination need not show that the discrimination rose to the level of a Title VII violation, but must at least show a reasonable belief that it did. *See generally Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. Unit A Sept. 1981).

Furthermore, Melvin's supervisor the day he walked off his shift, Luna, was not involved in the decision to terminate or discipline Melvin. To the contrary, Luna testified he did not believe Melvin's conduct was worthy of discipline. *See* Pl. Ex. G Luna Dep. 47:18–22, 99:10–14. Rather, Mendoza and Bills unilaterally decided to terminate Melvin without consulting Luna, without obtaining Melvin's version of events, and without warning in accordance with Hobby Lobby's progressive discipline policy. *See* Pl. Ex. P, HR Policies at 26; *see also* Pl. Ex. E, Mendoza Dep. 38:12–18. Mendoza and Bills, the same two Hobby Lobby supervisors with whom Melvin had previously lodged complaints of discrimination, made the decision to terminate Melvin before he had the opportunity to complain again. Moreover, they fired Melvin within days of his complaining about treatment he believed to be prejudicial. *See* Pl. Ex. M, HR Report.

To establish a prima facie case for retaliation "a plaintiff must demonstrate that the employer's decision 'was based in part on knowledge of the employee's protected activity.'" *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 305 (5th Cir. 2020) (quoting *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001)). When causation is based on "mere temporal proximity," that proximity must be "very close." *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). But when other evidence of a causal link is presented, consideration of the time between the protected activity and the adverse action is only "part of the analysis." *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir. 1992). Here, Melvin has established both temporal proximity and other evidence of a causal link between his complaining of discrimination and being fired. These facts, taken together, tell a story from which a reasonable jury could infer Melvin was terminated in retaliation for reporting allegations of unlawful discrimination. Melvin has therefore satisfied his burden to establish a prima facie case.

If a plaintiff makes a prima facie case of retaliation, the burden of proof then shifts to the defendant to show a nondiscriminatory reason for its adverse employment action. *McCoy*, 492 F.3d at 557; *accord Wheat*, 811 F.3d at 710. If the employer satisfies its burden, the burden shifts back to the plaintiff to show the employer's proffered reason is a pretext for the real retaliatory purpose. *Id*. Here, Hobby Lobby says Melvin was terminated for "insubordination" and "failure to follow company policies" when he walked off his shift after complaining of being given an assignment he believed to be prejudicial. Melvin counters Hobby Lobby's purported reason is pretextual because he did not refuse an order from his supervisor, who would have been Luna on the day of the incident that made the basis of this suit. *See* Pl. Ex. G, Luna Dep. 74:23–75:4; *see also* Pl. Ex. E, Mendoza Dep. 191:12.

According to Luna's testimony, Melvin questioned an order given to him by CSM Jimenez, who was not Melvin's supervisor. *See* Pl. Ex. G, Luna Dep. 54:12–13. Melvin then reported to Luna that he believed this assignment was being made prejudicially and told him that he wanted to discuss this with the District Manager. *See id*.; *see also* Pl. Ex. G, Luna Dep. 65:11–24. At no time did Luna direct Melvin to do something Melvin explicitly refused to do. *See id*. 93:20–94:12. Luna testified he would have just asked someone else to do this task. *See id*. 64:7–23. As the manager on duty at the time who directly responded to this situation, Luna did not believe Melvin needed to be terminated or disciplined for his actions that day. *See id*. 47:18–22, 99:10–14. Melvin's supervisors all agreed Melvin was a good employee and had no complaints about his work. *See* Pl. Ex. E, Mendoza Dep. 118:8–119:5; *see also* Pl. Ex. G, Luna Dep. 41:24–43:2. Rather, it was only once Mendoza and Bills learned Melvin again made a report of discrimination that they made the decision to fire him immediately. *See* Pl. Ex. E, Mendoza Dep. 212:9–213:13. Furthermore, the Fifth Circuit has recognized that failing to follow

a progressive discipline policy, as Hobby Lobby did in this case, even when the policy is not mandatory and the employee is at-will, can create an inference of pretext. *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 477 (5th Cir. 2015).

Bills' and Mendoza's swift move to terminate Melvin, without input from Luna, so soon after Melvin complained of prejudice, coupled with the failure to follow Hobby Lobby's progressive discipline policy, could lead a jury to reasonably infer the motivation was retaliatory. The Court, therefore, finds Melvin has met his burden to establish a genuine dispute for trial as to his retaliation claim and that claim shall proceed to trial.

### III.    Failure to Mitigate

Hobby Lobby argues, if the Court finds Melvin has a viable claim, which it has, the Court should dismiss the case because Melvin failed to mitigate damages. *See Sellers v. Delgado Community College*, 902 F.2d 1189, 1193 (5th Cir.1990), citing *Sellers v. Delgado Community College*, 839 F.2d 1132, 1136 (5th Cir.1988) (*Sellers II*). The Fifth Circuit has held that, even where an employer is found liable under Title VII, "back pay is not an automatic remedy, but is equitable in nature and may be invoked in the sound discretion of the district court." *Sellers II* at 1136. Exercise of this discretion is to be guided by the twin purposes of Title VII, which are "to achieve equality of employment opportunity and to make persons whole for injuries suffered on account of unlawful employment discrimination." *Floca v. Homcare Health Services, Inc.*, 845 F.2d 108, 111 (5th Cir.1988), citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975). Thus, back pay is designed in part to alleviate the "lingering ill effects" of employment discrimination. *Ford Motor Co. v. EEOC*, 458 U.S. 219, 235 (1982).

Successful Title VII claimants have a corresponding statutory duty to minimize such damages. *Sellers II*, 839 F.2d at 1136. Section 706(g) of the Civil Rights Act of 1964 provides

that "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." This statutory duty is rooted in "an ancient principle of law" requiring that "where one person has committed a … legal wrong against another it is incumbent upon the latter to use such means as are reasonable under the circumstances to avoid or minimize the damages. The person wronged cannot recover for any item of damage which could thus have been avoided." *Ford Motor Co. v. EEOC*, 458 U.S. at 231 n.15 (1982), quoting C. McCormick, *Law of Damages* 127 (1935).

Yet, the duty of a successful Title VII claimant to mitigate damages is not met by using reasonable diligence to obtain any employment. Rather the claimant must use reasonable diligence to obtain "substantially equivalent" employment. *Id.* at 232; *Sellers II*, 839 F.2d at 1138. The reasonableness of a Title VII claimant's diligence "should be evaluated in light of the individual characteristics of the claimant and the job market." *Rasimas v. Michigan Dept. of Mental Health*, 714 F.2d 614, 624 (6th Cir.1983). "Substantially equivalent employment" is that "employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the Title VII claimant has been discriminatorily terminated." *Sellers II*, 839 F.2d at 1138.

Although the statutory duty to minimize damages is placed on the Title VII plaintiff, the employer has the burden of proving failure to mitigate. *Id.* at 1139. To meet this burden, an employer may demonstrate that substantially equivalent work was available and that the Title VII claimant did not exercise reasonable diligence to obtain it. *Id.* Even so, "if an employer proves that an employee has not made reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially equivalent employment." *Id.* "Whether an

injured person has mitigated his damages requires a factual assessment of the reasonableness of his conduct." *Hill v. City of Pontotoc*, 993 F.2d 422, 427 (5th Cir. 1993).

Here, Melvin acknowledges he has been unemployed since his firing from Hobby Lobby; however, he explains his lapse in employment is due to mental health issues he suffered because of his firing. He further suggests he has been productive and able to contribute to household expenses by taking on primary childcare responsibility and assisting with his child's mother's construction contracting business, for which he accepts use of a vehicle in lieu of other payment. Whether Melvin acted reasonably in his employment-related decisions given his mental health and his family's need for flexibility is a fact question for the jury. Based on the record before it, the Court cannot conclude Melvin's failure to find new employment constitutes a failure to mitigate defeating his damages claim as a matter of law. Furthermore, even if a jury were to find Melvin failed to mitigate his claims for back and front pay, his failure to mitigate would not defeat his claim because he can recover compensatory damages under the statute for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. §§ 1981a(b)(3); *see also* § 1981a(a)(1). Thus, the Court denies Hobby Lobby's motion for summary judgment as to Melvin's damages claim.

## CONCLUSION

For the reasons discussed, the Court finds Melvin has met his burden to establish a genuine dispute for trial as to his retaliation claim but not as to his discrimination claim and, therefore, **GRANTS IN PART** and **DENIES IN PART** Hobby Lobby's Motion for Summary Judgment. *See* ECF No. 18. The Court, further, **DENIES WITHOUT PREJUDICE** Hobby Lobby's request for summary judgment on its failure to mitigate affirmative defense. Melvin's discrimination claim is **DISMISSED**. His retaliation claim shall proceed to trial.

It is so ORDERED.
SIGNED this 20th day of June, 2024.

_____
JASON  PULLIAM
UNITED STATES DISTRICT JUDGE